# In the United States Court of Federal Claims

No. 13-567C
Filed: August 29, 2014

```
* * * * * * * * * * * * * * * * *
NEW HAMPSHIRE FLIGHT              *
PROCUREMENT, LLC                 *
                                 *
                Plaintiff,       *
                                 *        Motion to Dismiss; Third-Party
                                 *        Beneficiary; Privity of Contract.
        v.                       *
                                 *
UNITED STATES,                   *
                                 *
                Defendant.       *
                                 *
* * * * * * * * * * * * * * * * *
```

        **Scott L. Levitt**, Law Offices of Levitt Law, APC, Seal Beach, CA, for plaintiff.

        **Gregg P. Yates**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Donald E. Kinner**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division, and **Stuart F. Delery**, Assistant Attorney General.

## O P I N I O N

<u>**HORN, J.**</u>

        Plaintiff, New Hampshire Flight Procurement, LLC (New Hampshire) brings this action against the United States related to the National Aeronautics and Space Administration's (NASA's) alleged failure to pay plaintiff for the use of, and damage to, plaintiff's Gulfstream II airplane. Plaintiff, New Hampshire, alleges that as a subcontractor, it leased a Gulfstream airplane to Flight Test Associates, the prime contractor, which then used the airplane in a government contract between Flight Test Associates and NASA for "High Ice Water Content testing," contract NNC11BA04B (the prime contract). Plaintiff states that the prime contract between Flight Test Associates and NASA "was for the use of a jet aircraft (a Gulfstream II), to be fitted with government owned testing equipment and to be flown with such installed equipment in areas of high ice accumulation." Plaintiff claims it has an express and implied-in-fact contract with the government, and is "a third party intended beneficiary to the" prime contract between the government and Flight Test Associates. Plaintiff claims, therefore,

that defendant (1) breached an express contract with plaintiff,[1] (2) breached an implied contract with plaintiff, (3) breached the covenant of good faith and fair dealing in contracts, and (4) is liable to plaintiff under a theory of quantum valebant. Plaintiff seeks as relief, "[l]ease Payments from September 1, 2012 through May 31, 2013," totaling $355,500.00, "[l]ease allocated 235 hours of flight time at $2,200 per hour," "[r]estoration of Gulfstream II," as well as interest, attorney's fees, and costs of the suit.[2]

Defendant filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief might be granted, pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) (2014). Defendant contends that this court lacks subject matter jurisdiction to hear plaintiff's first and second claims for relief, because plaintiff is not in contract privity with the government, either through an express or implied-in-fact contract. Defendant also argues that plaintiff is not an intended third-party beneficiary to the prime contract between the government and Flight Test Associates. Defendant contends that plaintiff's third claim for relief, for a breach of the implied covenant of good faith and fair dealing, fails to state a claim upon which relief can be granted, because, without a contract between the government and plaintiff, there cannot be a breach of this covenant. Finally, defendant contends that plaintiff's fourth claim for relief, under a theory of quantum valebant recovery, is an implied-in-law contract claim outside of this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2012).

## FINDINGS OF FACT

According to plaintiff, on December 20, 2010, NASA entered into a contract, NNC11BA04B, with Flight Test Associates for "High Ice Water Content testing." Plaintiff's complaint attaches a portion of the prime contract between Flight Test Associates and NASA, which was signed on behalf of NASA by contracting officer

---

[1] Plaintiff confuses its breach of express contract claim with its claim for relief as a third party beneficiary to the prime contract. As discussed below, these are not the same legal theories.

[2] Another subcontractor to the same prime contract between Flight Test Associates and NASA, contract NNC11BA04B, named Threshold Technologies Inc. (Threshold), also brought a suit in this court, alleging that NASA failed to compensate Threshold for "operations, maintenance, and installation/disintegration services," for the Gulfstream jet provided by plaintiff, New Hampshire. See Threshold Techs., Inc. v. United States, No. 13-599C (Fed. Cl. filed Aug. 21, 2013). In Threshold's complaint, Threshold explains that although it brings suit under the name Threshold Technologies, Inc., Threshold is "also referred to as Threshold Aviation Group," and there is no difference between the entities. See id. at 1. The lawsuit in the Threshold case was filed by the same attorney and the briefs filed in both cases closely resemble each other, with factual differences discussed; but arguments and case citations closely parallel each other. In the Threshold case, defendant filed a partial motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

Timothy M. Bober and the president of Flight Test Associates, John Ligon. According to the prime contract's first page, the prime contract was awarded by NASA to Flight Test Associates on December 20, 2010.[3]

Defendant attaches to its motion to dismiss the prime contract's statement of work. The statement of work does not reference the prime contractor Flight Test Associates or the subcontractor New Hampshire. According to the introduction to the statement of work:

> Over the past 10 years, there have been a significant number of jet engine power-loss events (flameout, stall, rollback and surge) occurring in and around areas of deep tropical convection at higher altitudes (mostly above 20,000 ft).
>
> . . .
>
> The intent of this contract is for a Contractor to provide an aircraft modified with Government furnished instrumentation to conduct High Ice Water Content (HIWC) flight research during a trial flight campaign and primary flight campaign(s) based out of Darwin Australia during the monsoon season between January - March. This Statement of Work (SOW) sets forth the requirements to conduct HIWC research through an Aircraft Services Contract. The research to be conducted by the Government will require close coordination between Government and Contractor personnel during all phases of this contract.

According to the scope of the statement of work for the prime contract between Flight Test Associates and NASA, "[t]he Contractor shall provide all personnel (including pilots), equipment, tools, etc., except as provided in Section 4.1 or as otherwise noted, necessary to conduct the HIWC [High Ice Water Content] research flights required to meet NASA's testing requirements." The statement of work also explains that:

> The Contractor shall provide . . . ***Aircraft Preparation*** . . . an aircraft as specified in Section 4.3 and integrate all instrumentation as specified in Section 4.1 of this document on the aircraft while coordinating the instrument locations, mounting design concepts and fabrication, and instrument installation with NASA and partner researchers and aviation safety personnel.

---

[3] The parties have not provided the entire prime contract between Flight Test Associates and NASA to the court. Rather, plaintiff, New Hampshire, provided in its complaint Parts I through III of the prime contract NNC11BA04B, the contract "SCHEDULE," "CONTRACT CLAUSES," and "LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH." (capitalization in original). Defendant also provided, as part of its motion to dismiss, "Attachment A" to the prime contract, titled "Statement of Work (Change A) for Aircraft Services to Conduct High Ice Water Content Flight Research."

(emphasis in original). The statement of work indicates that the prime contractor, Flight Test Associates, was to be further responsible for: "***Trial Flight Campaign***," "***Primary Flight Campaign(s)***," and "***Aircraft final de-integration and return of Government Furnished Properly (GFP) and partner hardware***." (emphasis in original). Section 4.2 of the statement of work discusses where the plane would be based: "Both flight campaigns includes [sic] the round trip ferry flight to and from the airport base of operation for the trial campaign. The point of origin for the ferry flights is the aircraft's home base of operation designated by the Contractor."

The prime contract between Flight Test Associates and NASA states under "**SCOPE OF CONTRACT**," that, "[t]he contractor shall, except as otherwise specified herein, furnish all personnel, facilities, materials and services required to perform the work outlined in Section C hereof." (capitalization and emphasis in original). The prime contract was to be a firm fixed price contract for $9,962,787.00. The prime contract between Flight Test Associates and NASA states that payments to the contractor were to be milestone-based, with separate payments after plaintiff completed "Aircraft Preparation," "Trial Flight Campaign," "Primary Flight Campaign," "Aircraft De-integration and Return of GFP [government-furnished property]," with an "Option for an Additional Flight Campaign." The prime contract further states that, "[o]nly the Contracting Officer may issue task orders to the Contractor," and that "[n]o other costs are authorized unless otherwise specified in the contract or expressly authorized by the Contracting Officer."

The prime contract between Flight Test Associates and NASA put the risk of delay or issues with the aircraft on the prime contractor, Flight Test Associates:

> In accordance with Section 8.5 of the Statement of Work, the following performance standards will exist for calculating payments for aircraft usage under task orders:
>
> > (a) Should the aircraft preparation schedule get delayed due to Contractor issues and prevent NASA from conducting the flight campaigns as stated in this SOW, the Government will not incur any costs for occupying the aircraft from the start of the originally proposed flight campaign to the start of the actual flight campaign.
> >
> > (b) When a flight is not possible during a given day due to failure of the Contractor's equipment or documentation to pass NASA safety requirements, the aircraft occupancy payment may be reduced by 10% for each day lost for that week.
> >
> > (c) NASA will not pay for flights benefiting the Contractor, such as flights for maintenance testing, for ferrying to and from maintenance facilities, flights required following an engine change, commercial charters, and flights solely for transporting Contractor's personnel.

The prime contract between Flight Test Associates and NASA also incorporates by reference Federal Acquisitions Regulations "**52.233-4 APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM (OCT 2004)**," "**52.242-13 BANKRUPTCY (JUL 1995)**," as well as "**52.249-8 DEFAULT (FIXED PRICE SUPPLY AND SERVICE) (APR 1984)**." (capitalization and emphasis in original).

Plaintiff alleges that, "FTA [Flight Test Associates] does not, nor has it ever owned a Gulfstream II aircraft, or any other aircraft that could be used under the Contract." Plaintiff further alleges that "[d]efendant had complete knowledge of the fact that FTA, the 'Contractor' under the Contract did not own such aircraft." Plaintiff contends that Section H.13 of the prime contract between Flight Test Associates and NASA makes clear that the prime contractor, Flight Test Associates, would have to rely on a subcontractor to provide the aircraft. According to Section H.13 of the prime contract between Flight Test Associates and NASA:

**H.13 MONITORING OF SUBCONTRACTOR**

The parties agree that this contract was negotiated on the basis that the Contractor's proposed operations subcontractor, Threshold Aviation Group,[4] will provide the aircraft under lease to the prime contractor and will be performing contract requirements related to the airworthiness of the aircraft, aircraft operations, and aircraft maintenance. The parties agree that the proposed subcontractor's performance is critical to the success of the contract. Therefore, the Contracting Officer's written approval is required for any substitution of another operations subcontractor.

Additionally, the Contractor shall ensure that the subcontractor's operations conform to all contract requirements, including, without limitation, the requirement that performance conform to the requirements of NPR 7900.3, Aircraft Operations Management, as set forth in sections 6-8 of the Statement of Work (SOW) and the requirements pertinent to the authority and responsibility of the NASA Test Director as set forth in section 8.10.9 of the SOW.

The Contractor shall ensure that there are clear lines of communications, including, when necessary, direct communications, between the Government and the operations subcontractor to ensure airworthiness, and safe and successful operations and maintenance of the aircraft.

Nothing herein relieves the Contractor from responsibility for performing this contract.

---

[4] New Hampshire, not Threshold, was the entity that contracted with Flight Test Associates to supply the aircraft, through a separate aircraft least agreement. Defendant agrees that Threshold only provided "operations, maintenance, and installation services."

(emphasis and capitalization in original). Plaintiff explains that, "[d]espite the Contract's language, the aircraft was not supplied by Threshold Aviation Group, the aircraft, a Gulfstream II (N81RR), was supplied directly by Plaintiff [New Hampshire] to FTA [Flight Test Associates] via a lease dated January 6, 2011." Plaintiff further explains that Threshold "did not, nor has it ever owned or asserted that it has owned the Gulfstream II aircraft (the 'Aircraft'), instead Threshold merely supplied operations, maintenance, and installation/disintegration services." Defendant admits that "[t]he prime contract incorrectly identifies Threshold as the provider of the aircraft."

Attached to its complaint, plaintiff provides a subcontract between plaintiff and the prime contractor, Flight Test Associates, titled an "Aircraft Lease Agreement" between New Hampshire and Flight Test Associates, signed January 10, 2011. The aircraft lease agreement between New Hampshire and Flight Test Associates states:

> This Aircraft Lease Agreement (this "Lease") is made and entered into as of the 6th day of January, 2011, by and between New Hampshire Flight Procurement, LLC, a New Hampshire Limited Liability Company, having its principal office at 25 New Orchard Road Pittsfield, NH 03263 (hereinafter referred to as "Lessor"), and Flight Test Associates, Inc., a Delaware Corporation, having its principal office at 1031 Mobley, Hangar 100, Mojave, California, 93501 (hereinafter referred to as "Lessee"). . . . It is understood that the use of the Aircraft will primarily be in support of Lessees [sic] contract with NASA, to evaluate High Ice Water Conditions ("HIWC").

The lease between New Hampshire and Flight Test Associates was for a "Gulfstream G-1159" airplane. The aircraft lease agreement further states that, "Lessor [plaintiff] shall enter into a service and maintainance [sic] agreement with" Threshold, and that "Lessee shall enter into an operational and flight management agreement with Threshold."

The aircraft lease agreement between New Hampshire and Flight Test Associates, provided by plaintiff, states that the airplane's base of operation was Mojave, California, the location of the principal office of Flight Test Associates, except for when the aircraft was undergoing maintenance or in use by NASA. According to the aircraft lease agreement, for the term of the lease, Flight Test Associates was to pay New Hampshire "lease payments of $35,000.00 due on the 5th day of the month commencing on February 5, 2011 and continuing for the term of the Lease," as well as either $4,500.00 per month when the plane is "on the Ground," or $9,500.00 per month "[w]hen Aircraft is on Flight Status." In addition, Flight Test Associates was also to pay plaintiff $2,200.00 per flight hour for aircraft and engine maintenance. Flight Test Associates also agreed, under the lease agreement with New Hampshire, to

> bear all operating costs, crew salaries, benefits, fuel and fuel additives, landing and Customs fees, hangar, ramp and storage charges, any fines

or penalties arising from the operation or use of the Aircraft by Lessee [Flight Test Associates]. Lessor [New Hampshire] shall not be obligated to pay any taxes levied directly related to the use of the Aircraft by Lessee.

The aircraft lease agreement between the lessor, New Hampshire and the lessee, Flight Test Associates contains numerous provisions to address contingencies in case the underlying contract with NASA was terminated. According to the aircraft lease agreement, "[i]n the event that NASA terminates the HIWC contract, Lessee shall be allowed to cancel this Lease Agreement" upon proper notification. In such case, "[t]he lease term shall include the period during which the Aircraft will be returned to its original configuration in accordance with ARTICLE III; and, all lease payments owing are paid until the date on which the Aircraft is returned and all work is completed for returing [sic] to original configuration." In addition, according to the aircraft lease agreement between New Hampshire and Flight Test Associates, "[s]hould NASA terminate it's contract with Lessee, Lessee shall return the Aircraft to Chino, CA, and continue to pay the agreed upon monthly Lease rate until the Aircraft is restored to its orginal [sic] state." Default by Flight Test Associates under the airplane lease agreement with New Hampshire included failure to make payments, failure to observe the covenants of the agreement, false representation, failure to do business as a going concern, a filing of bankruptcy, and a court judgment in bankruptcy against Flight Test Associates. Under the lease agreement between New Hampshire and Flight Test Associates, in the event of such default by Flight Test Associates, plaintiff had the right to, "[d]eclare the entire amount of rent accrued hereunder immediately due and payable and accelerate the terms of this Lease," and "[c]ause Lessee, at Lessee's expense, to return the Aircraft to Lessor at a point in the United States designated by Lessor." The aircraft lease agreement between New Hampshire and Flight Test Associates made clear under its "**Miscellaneous**" terms that, "[n]o governmental approval is required for Lessor or Lessee to enter into this Lease." (emphasis in original).

According to plaintiff's complaint, "[w]ithin the first few months" after the start of the prime contract between the government and Flight Test Associates, "FTA began to breach the Contract, and had stopped paying both Threshold and Plaintiff [New Hampshire] monies owed to each, respectively." Plaintiff alleges that "[o]n June 14, 2012, Mark DiLullo, CEO of Threshold, sent Ron Colantonio and Peter Struk, both of NASA, a letter detailing the lack of payment by FTA:"

A meeting was held on Tuesday, June 12, 2012 at FTA's office . . . At the meeting FTA [Flight Test Associates] advised TTI [Threshold] that it was unable to pay TTI for any of the current or past due amounts and that FTA was unwilling to discuss or establish a payment schedule for the invoices that are currently due and payable. Further, FTA was unwilling to provide any assurances as to when TTI would be paid, if at all . . . TTI is also aware of the fact that certain <u>lease payments pursuant to the Aircraft Lease Agreement between FTA, as Lessee and New Hampshire Flight Procurement, LLC ("Lessor") are past due and FTA is in breach of this agreement as well</u>.

(omissions and emphasis in original). Plaintiff further alleges, "[d]espite this June 14, 2012 letter, NASA continued to make payments to FTA, even though they had actual knowledge that Threshold and Plaintiff [New Hampshire] had not received payments due." Plaintiff states that on August 29, 2012, Mr. John Ligon, "president and owner of FTA," passed away, and that, "FTA, without its owner, essentially ceased to function and continued to default with regard to its obligations under the Contract, and in its failure to pay Plaintiff [New Hampshire] and THRESHOLD." (capitalization in original). On September 21, 2012, as provided by defendant in its motion to dismiss, NASA sent a cure notice e-mail to Flight Test Associates, stating that: "You [Flight Test Associates] are hereby notified that the Government considers FTA's current financial condition and failure to remain current on its financial obligations to be conditions that are endangering performance of the contract." On October 9, 2012, NASA sent Flight Test Associates another e-mail, stating in relevant part:

> FTA notified NASA on September 25, 2012 that the personnel working on the HIWC project were furloughed, and all ongoing work on aircraft modifications was stopped. On September 28[th], NASA leased hangar space for the G-II [Gulfstream II] at ASB Avionics and requested that FTA coordinate the movement of the plane from the FTA hangar to the ASB hangar in order to provide a more secure environment for the plane and the Government property on board. NASA has been paying the hangar rental fees since that date.

> NASA was copied on a letter from attorney Scott L. Levitt dated October 1, 2012 indicating that FTA is in default of the lease terms with New Hampshire Flight Procurement. This letter leaves us uncertain as to the status of the plane. NASA's current lease of the ASB hangar space is paid through 10/12/12. Because there is still a substantial amount of Government property on board the plane, and the ongoing status of the HIWC project within NASA is still undetermined, we need to ensure that the aircraft will be kept in a secure location where Government personnel can have continued access.

> We have not received any notice from FTA regarding any change in the official status of the aircraft lease. NASA is hereby requesting response to the following questions:

>> 1. What is the current status of the aircraft lease between FTA and NHFP?
>> 2. Who has legal custody of the aircraft at this time?
>> 3. Is the aircraft currently covered by insurance? What are the limits of that coverage?
>> 4. What is your intent regarding the location of the plane and the hangar rental beyond 10/12/12?

Please respond to the above questions by October 11, 2012 and copy both myself and NASA counsel Jerald Kennemuth.

According to plaintiff, "[o]n October 3, 2012, Plaintiff via its counsel, Scott L. Levitt of Levitt Law, APC [a professional corporation], conducted a telephonic conversation with Jerald J. Kennemuth, Attorney for NASA, to discuss past due payments owed to Plaintiff stemming from the Contract." Plaintiff further states that "[o]n October 15, 2012, New Hampshire sent NASA, via Threshold, an invoice for lease and insurance payment totaling $39,500.00 for the month of September."

Plaintiff alleges that, finally, "after numerous correspondence by Plaintiff" with NASA, "regarding lack of payments and lack of progress by FTA on the Contract requirements, NASA, on October 19, 2012 terminated the Contract with FTA." On October 30, 2012, James Fullmer, "Managing Member" of New Hampshire, sent a letter to Ms. Karin E. Huth, NASA Glenn Research Center Contracting Officer. The letter states in relevant part in part:

> We fully support preserving the aircraft modifications for future use for the HIWC program and not compromising the program in any way. Of course, we make this commitment with the understanding that a resolution between NASA and Threshold Aviation Group (TAG) for continuation of the program occurs in a reasonable period of time, hopefully by the end of 2012. At some point thereafter, we would need to implement the Aircraft De-Integration and Return to Service Program described in your agreement with FTA if the program does not continue.
> . . .
> NHFP is interested in entering into an interim contract to:
> 1). Permit any remaining Government property to remain on the plane until a final program decision is made on the HIWC project;
> 2). Retain the ability for NASA personnel to access the plane; and,
> 3). Keep an open line of communication with NASA as to the plane's condition and any maintenance or modifications being made.
> . . .
> With respect to the lease payment due to NHFP under our lease with FTA, we request that any lease payments not paid to FTA but funded within the NASA budget be paid to NHFP. NHFP is currently due September rent and rent through October 19, 2012, and have enclosed an invoice for this rental period. We respectfully request this rent be paid at this time.
>
> I also request that the funds allocated in the NASA budget under Task Order 4 Aircraft (De-Integration and Return to Service) be made available to NHFP should NASA elect not to continue the program.

The same day, October 30, 2012, plaintiff alleges that its counsel also sent a letter to Mr. Kennemuth, NASA counsel, stating:

"My client obviously is concerned about being <u>compensated for the time that has elapsed in which it has not received lease, insurance and other payments on the plane</u>, as well as receiving the restoration amount as agreed upon to bring the Aircraft back to the state of condition as it was at the beginning of the HWIC [sic]. The agreement between NASA and FTA allocated $234,889.00 under CLIN 4 for such work. Should NASA not continue with the program and use of this Aircraft, NHFP [New Hampshire] would expect immediate payment of such directly to NHFP."

(internal citation omitted in original; emphasis in original).

According to defendant, on November 3, 2012, "Threshold arranged to fly the aircraft from NASA's leased hangar in to its own hangar in Chino, California.[5] At the time that Threshold moved the aircraft, the aircraft still had NASA's HWIC [sic] equipment installed in it." (internal citation omitted). Plaintiff alleges that on November 6, 2012, "Defendant's representative, Karin Huth, e-mailed Plaintiff's principal, James L. Fullmer, requesting cost estimates, 'for (1) <u>continued leasing</u> of the N81RR aircraft and (2) the cost buy-out if NASA wanted the option to purchase the plane . . . .'" (emphasis in original). According to plaintiff, "[w]ithin days, Plaintiff's principal, James L. Fullmer provided such information to Huth."

Plaintiff contends, however, that, instead of following up on this request, "NASA continued to maintain dominion and control over the Gulfstream II aircraft," and that "[a]t no time, during September 1, 2012, through the date of the filing of this Complaint, did Plaintiff receive monies for the Aircraft which was possessed and controlled by NASA, and which had NASA owned property installed in it, rendering the Aircraft unusable for any other use." Plaintiff presents as evidence of NASA's possession, "a March 12, 2013 e-mail sent by Karin Huth, Contracting Officer of NASA to Threshold stating, 'Once these items have been removed from the plane, <u>I anticipate that NASA will want to do a final review of the aircraft and will then be ready to have the plane returned to possession by the aircraft owner</u>.'" (internal citation omitted in original; emphasis added). Plaintiff further contends that "[f]rom October 19, 2012 and at various times since, Defendant has requested that the Aircraft containing its equipment be secured and safe, and that its equipment remain on said Aircraft and that such equipment be accessible to Defendant."

---

[5] Defendant, in support, submitted a letter from a Mr. Mark DiLullo, to Ms. Huth, stating that "N81RR departed KMHV arrived KCNO on 11/3/2012." The aircraft lease between New Hampshire and Flight Test Associates attached to plaintiff's complaint gives the registration for the Gulstream G-1159 airplane leased to Flight Test Associates as N81RR. The acronym "KMHV" refers to Mojave Airport, in Mojave, California, <u>see Mojave, CA</u>, Weather.gov, Nat'l Weather Service, http://w1.weather.gov/xml/current_obs/KMHV.xml (last updated Aug. 29, 2014), and "KCNO" refers to Chino Airport in Chino, California. <u>See Chino Airport</u>, Cnty. of San Bernardino Dep't of Airports, http://cms.sbcounty.gov/airports/Airports/Chino.aspx (last visited Aug. 29, 2014).

On March 20, 2013, "after receiving no payment or express written contract from NASA," New Hampshire sent a letter to NASA demanding payment for $1,137,232.15, not including attorneys fees and storage costs, and stated in the letter that "'[s]hould this amount be received within thirty (30) days, we will not seek sums beyond the specific amount.'" Threshold, another subcontractor of Flight Test Associates, sent a separate letter to NASA contracting officer Ms. Huth, dated March 25, 2013, which states, in relevant part:

> As a follow up to the March 25[th] correspondence, we [New Hampshire and Threshold] believe that a meeting with yourself and any other appropriate NASA personnel is appropriate. TAG [Threshold Aviation Group], NHFP and NASA need resolution and closure in the form of payment for services rendered and the return of government owned property, which are mutually exclusive. A fast and friendly resolution is in the best interests of all parties.

The letter included a list of "***TAG Unpaid Costs and Loss of Revenue Resulting From HIWC Cancellation***." (capitalization and emphasis in original). According to plaintiff, New Hampshire, "[o]n April 18, 2013, almost one month later and after several inquires, Plaintiff [New Hampshire] received response [sic] from NASA via its counsel, Kennemuth, denying all of Plaintiff's claim."

According to plaintiff, "finally, on May 15, 2013, NASA had the final government owned equipment removed from the aircraft," and on May 16, 2013, Threshold notified New Hampshire of the removal. According to plaintiff, "[t]he Aircraft, due to modifications and destruction by Defendant's prime contractor [Flight Test Associates], under the Contract, is unable to be flown or used as a result of the installation, partial disintegration, and modifications done on the Aircraft." Plaintiff, New Hampshire, states that, on May 21, 2013, it sent "its formal, certified claim letter to Karin Huth, Contracting Officer for NASA," for $1,107,389.00. According to plaintiff, it "received the response from NASA to its May 21, 2013, certified claim, on August 2, 2013. Such response denied all claims and damages of Plaintiff."

Plaintiff filed a complaint in this court alleging, as stated above, four causes of action. Plaintiff first claims that defendant breached (1) an express contract with plaintiff, arguing at the same time that plaintiff is an intended third party beneficiary to the prime contract between the government and Flight Test Associates. Plaintiff also claims defendant (2) breached an implied contract with plaintiff, and (3) breached the covenant of good faith and fair dealing. Finally, plaintiff (4) argues for recovery from defendant under a theory of quantum valebant. Plaintiff seeks: "[l]ease Payments from September 1, 2012 through May 31, 2013," of "$355,500.00 (nine months' rent, including insurance on the aircraft) and the per diem amount from May 31, 2013 through the date of payment," "[l]ease allocated 235 hours of flight time at $2,200 per hour totaling $517,000.00 for calendared and hourly maintenance," "[r]estoration of Gulfstream II (this

sum is listed explicitly as $234,889.00 in NASA Contract No. NNCIBA04B),” and for interest, attorney's fees, and costs of the lawsuit. (all emphasis in original).

In response, defendant filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief might be granted, pursuant to RCFC 12(b)(1) and RCFC 12(b)(6). As also noted above, defendant argues that “[t]his Court does not possess subject matter jurisdiction to entertain NHFP's complaint for unpaid rent for its aircraft and related costs,” under any of its theories. Regarding plaintiff's breach of express contract claim, and third party beneficiary claim, defendant maintains that “the prime contract does not indicate that NASA and the FTA [sic] intended to confer rights to NHFP.” Regarding plaintiff's breach of implied contract claim, defendant maintains that plaintiff “fails to allege facts sufficient to support an implied-in-fact contract between the Government and NHFP.” Defendant further argues that, to the extent plaintiff is claiming that an implied-in-law contract was breached, this would be outside the court's jurisdiction under the Tucker Act. Regarding plaintiff's breach of the covenant of good faith and fair dealing claim, defendant argues that plaintiff states a claim upon which relief cannot be granted because this covenant “does not arise where the parties have no contract between them, as is the case here.” Regarding plaintiff's quantum valebant claim, defendant argues that such a claim is based upon an implied-in-law contract theory of recovery, which is “outside this Court's jurisdiction.”

## DISCUSSION

It is well established that “‘subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.’” Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). “[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.” Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) (“When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented.”); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) (“Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.” (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) (“This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue.”), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 909 (2011); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (“Subject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue.” (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part, 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); Special

Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case."); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Centr. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment."); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also SRA Int'l, Inc. v. United States, 114 Fed. Cl. 247, 251 (2014); Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part).

In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Fed. R. Civ. P. 8(a)(2) (2014); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court, in the Twombly case, stated that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain

something more . . . than . . . a statement of facts that merely creates a
suspicion [of] a legally cognizable right of action"), on the assumption that
all the allegations in the complaint are true (even if doubtful in fact), see,
e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002) ("Rule
12(b)(6) does not countenance...dismissals based on a judge's disbelief of
a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236
(1974) (a well-pleaded complaint may proceed even if it appears "that a
recovery is very remote and unlikely"). . . . [W]e do not require heightened
fact pleading of specifics, but only enough facts to state a claim to relief
that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations
omitted; brackets and omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570); Bell/Heery v.
United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed.
Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The
facts as alleged 'must be enough to raise a right to relief above the speculative level, on
the assumption that all the allegations in the complaint are true (even if doubtful in
fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555)); Totes-Isotoner Corp. v.
United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 131 S. Ct. 92 (2010);
Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid
dismissal for failure to state a claim, the complaint must allege facts 'plausibly
suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell
Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir.
2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331,
1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially
'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373,
1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above
the speculative level. This does not require the plaintiff to set out in detail the facts upon
which the claim is based, but enough facts to state a claim to relief that is plausible on
its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed.
Cir.), cert. denied, 557 U.S. 937 (2009); Vargas v. United States, 114 Fed. Cl. 226, 232
(2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244
(2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010),
appeal dismissed, 454 F. App'x 900 (2011); Legal Aid Soc'y of New York v. United
States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010).

When deciding a case based on a lack of subject matter jurisdiction or for failure
to state a claim, this court must assume that all undisputed facts alleged in the
complaint are true and must draw all reasonable inferences in the non-movant's favor.
See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a
defendant's motion to dismiss, a judge must accept as true all of the factual allegations
contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing
Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. at
236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on

the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

Defendant in its motion to dismiss contends that "there is no privity of contract between the government and NHFP." Contract claims against the United States are governed by the Tucker Act, which grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nat., 556 U.S. 287, 289-90 (2009); United States v. Mitchell, 463 U.S. 206, 215 (1983); see also Kam-Almaz v. United States, 682 F.3d at 1368; Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

As stated in the Tucker Act, privity of contract between a plaintiff and the United States government is required to bring a cause of action in the United States Court of Federal Claims for express and implied contracts. See Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1) (1994); We have stated that '[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government.' Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990)."), cert. denied, 528 U.S. 820 (1999); see also Estes Exp. Lines v. United States. 739 F.3d 689, 693 (Fed. Cir. 2014); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (The "government consents to be sued only by those with whom it has privity of contract."); S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir.) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim," but noting exceptions to this general rule (citing Anderson v. United States, 344 F.3d 1343,

1352 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); United States v. Algoma Lumber Co., 305 U.S. 415, 421 (1939))), reh'g and reh'g en banc denied (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006); Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract.").

To have privity of contract with the United States government, and, therefore, invoke the jurisdiction of the United States Court of Federal Claims for its breach of contract claim, plaintiff "must show that either an express or implied-in-fact contract underlies [the] claim." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established." Russell Corp. v. United States, 210 Ct. Cl. 596, 606, 537 F.2d 474, 481 (1976), cert. denied, 429 U.S. 1073 (1977). Implied-in-fact contracts are agreements "'"founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."'" Trauma Serv. Grp. v. United States, 104 F.3d at 1325 (quoting Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))); see also Kam-Almaz v. United States, 682 F.3d at 1368; Bank of Guam v. United States, 578 F.3d at 1329 (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1326); Bay View, Inc. v. United States, 278 F.3d 1259, 1265-66 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 285 F.3d 1035 (Fed. Cir.), cert. denied, 537 U.S. 826 (2002); Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 203 (2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. at 728 (citing Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 597; Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482. Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 598; see also Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482.

"A party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration.'" Bank of Guam v. United States, 578 F.3d at 1326 (quoting Trauma Serv. Grp. v. United States, 104 F.3d at 1325); see also Chattler v. United States, 632 F.3d 1324, 1330 (Fed. Cir.) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325), reh'g en banc denied (Fed. Cir. 2011); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (citing City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998)); Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir.) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract.") (citations omitted), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 522 U.S. 857 (1997); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. 760, 767 (2014); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 492 (2013); Council for Tribal Emp't Rights v. United States, 112 Fed.

Cl. 231, 243 (2013). "'A well pleaded allegation of an express, or implied-in-fact, contract necessarily includes allegations going to each of the requisite elements of a contract.'" De Archibold v. United States, 57 Fed. Cl. 29, 32 (2003) (quoting McAfee v. United States, 46 Fed. Cl. 428, 432, appeal dismissed, 243 F.3d 565 (Fed. Cir. 2000)). The elements of a binding contract with the United States are identical for express and implied-in-fact contracts. See Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) ("The elements of an implied-in-fact contract are the same as those of an oral express contract."), cert. denied, 550 U.S. 934 (2007); Hanlin v. United States, 316 F.3d at 1328 ("Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."); City of Cincinnati v. United States, 153 F.3d at 1377 ("Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.' . . . When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract." (quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)); Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Russell Corp. v. United States, 210 Ct. Cl. at 608–09); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. at 767 ("The elements are the same for an express or implied-in-fact contract . . ."); Vargas v. United States, 114 Fed. Cl. at 233; Prairie County, Montana v. United States, 113 Fed. Cl. 194, 202 (2013); Mastrolia v. United States, 91 Fed. Cl. 369, 384 (2010) (citing Flexfab, L.L.C. v. United States, 424 F.3d at 1265). The government, however, "'is not bound by its agents acting beyond their authority and contrary to regulation.'" Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1153 (Fed. Cir. 1983) (quoting Yosemite Park and Curry Co. v. United States, 217 Ct. Cl. 360, 370, 582 F.2d 552, 558 (1978) (citing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947))) (other citations omitted); see also Chattler v. United States, 632 F.3d at 1330; Toon v. United States, 96 Fed. Cl. 288, 299-300 (2010); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. at 714.

Although plaintiff argues that defendant breached an express contract between plaintiff and the federal government, plaintiff appears to confuse this claim with its other, primary argument that plaintiff was an "intended third party beneficiary" under the prime contract between Flight Test Associates and the federal government. The United States Court of Appeals for the Federal Circuit has viewed claims for relief due to third party beneficiary status as distinct from claims for relief due to privity of express or implied contract. See Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1056 (Fed. Cir.), cert. denied, 133 S. Ct. 126 (2012) ("A plaintiff lacking privity of contract can nonetheless sue for damages under that contract if it qualifies as an intended third-party beneficiary."); Alpine Cnty., Cal. v. United States, 417 F.3d 1366, 1368 (Fed. Cir. 2005) ("In order to sue for damages on a contract claim, a plaintiff must have either direct privity or third-party beneficiary status."); Anderson v. United States, 344 F.3d at 1352 ("Without either direct privity or third-party beneficiary status, the Paul sons lack standing to sue the government and cannot therefore recover damages from the United States."); Nelson Const. Co. v. United States, 79 Fed. Cl. 81, 95 (2007); Entergy Nuclear Indian Point 2, LLC v. United States, 64 Fed. Cl. 515, 523 (2005) ("To have standing to bring a breach of contract claim, plaintiffs must also be in privity of contract

17

with the government or a third party beneficiary of a contract with the government."); see also Sullivan v. United States, 625 F.3d 1378, 1380 (Fed. Cir. 2010) ("This Court has recognized limited exceptions to that general rule when a party standing outside of privity 'stands in the shoes of a party within privity.'" (quoting First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999), reh'g en banc denied (Fed. Cir. 2000))); O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. 178, 188 (2006) ("The third-party beneficiary exception exists to cover situations in which the subcontractor 'stands in the shoes of a party with privity.'" (quoting First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d at 1289)). But see Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003) (holding that "Appellants could establish privity of contract if they are intended third-party beneficiaries of a contract with the United States . . . ." (citing First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d at 1289); Stockton E. Water Dist. v. United States, 70 Fed. Cl. 515, 526 (2006) ("One method of 'establish[ing] privity of contract [is] if [plaintiffs] are intended third-party beneficiaries of a contract with the United States . . . .'" (quoting Chancellor Manor v. United States, 331 F.3d at 901)) (modifications in original), judgment entered, 75 Fed. Cl. 321, modifying in part, 76 Fed. Cl. 470, reconsideration denied, 76 Fed. Cl. 497 (2007), rev'd on other grounds, 583 F.3d 1344 (Fed. Cir. 2009), partial reh'g granted, 638 F.3d 781 (Fed. Cir. 2011); Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 532 ("Such privity would exist if the irrigators are properly viewed as third-party beneficiaries to the district contracts." (citing Chancellor Manor v. United States, 331 F.3d at 901, and First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d at 1289)), modifying order, 68 Fed. Cl. 119, denying certification, 69 Fed. Cl. 160 (2005).

Plaintiff, New Hampshire, in the case currently before the court, does not allege any facts that cause the court to believe that plaintiff could establish that New Hampshire held an express contract with defendant. See Bank of Guam v. United States, 578 F.3d at 1326 ("A party alleging either an express or implied-in-fact contract with the government must show a mutual intent to contract including an offer, an acceptance, and consideration.") (quotation omitted); Russell Corp. v. United States, 210 Ct. Cl. at 608 ("For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established."); see also Black's Law Dictionary 393, 701 (10th ed. 2014) ("**[E]xpress**" is defined in part as "[c]learly and unmistakably communicated; directly stated with direction and clarity." "**_[E]xpress contract_**" is defined as "[a] contract whose terms the parties have explicitly set out."). (emphasis in original).

Plaintiff alleges that both parties provided consideration, one of the requirements of contract formation, since plaintiff provided the aircraft and defendant "promised to pay compensation in exchange for use of the Aircraft." Plaintiff, however, does not allege any written agreement between plaintiff and defendant, or any form of unconditional acceptance or intent by the government to be bound to plaintiff. Plaintiff does not contend that it was a signatory party to the prime contract between Flight Test Associates and the federal government, and plaintiff admits in its complaint that it was a

"subcontractor" to Flight Test Associates. The prime contract attached to plaintiff's complaint only shows, as signatories, the government's contracting officer and Mr. Ligon from Flight Test Associates. The prime contract between Flight Test Associates and NASA contains none of the terms one might expect to see if the government intended the contractual terms to flow directly to plaintiff. The prime contract between Flight Test Associates and NASA also does not specify a right of recourse against the government on behalf of any subcontractor – only Section H.13, "**MONITORING OF SUBCONTRACTOR**" even mentions any subcontractor. (capitalization in original). New Hampshire's airplane lease with Flight Test Associates also provides no support for plaintiff's express contract claim. In fact, the lease agreement between New Hampshire and Flight Test Associates explicitly states that the government was not a participant in the lease agreement: "No governmental approval is required for Lessor or Lessee to enter into this Lease." Additionally, no obligations on the part of the government are expressed in the lease agreement between plaintiff and Flight Test Associates. Instead, the lease agreement makes clear that plaintiff, New Hampshire, in the case of nonpayment, is to seek recourse against Flight Test Associates. The lease agreement states that, plaintiff can "accelerate the terms of this Lease and demand and recover from Lessee [Flight Test Associates] damages," and "[c]ause Lessee, at Lessee's expense, to return the Aircraft to Lessor at a point in the United States designated by Lessor." Plaintiff, therefore, has failed to demonstrate that an express contract was created between New Hampshire and the United States government.

Alternatively, plaintiff argues that New Hampshire is an intended third party beneficiary to the prime contract between defendant and Flight Test Associates. According to plaintiff:

> The fact that the Contract explicitly lists the subcontractor, dedicates an entire section to the subcontractor, and states that the, "subcontractor's performance is critical to the success of the contract . . ." more than satisfies the Court's requirements that, the contract reflect the express or implied intention of the [contracting] parties to benefit the third party.

(modification in original). Plaintiff focuses on Section H.13 of the prime contract between Flight Test Associates and NASA, stating:

> "H.13 MONITORING OF SUBCONTRACTOR
>
> The parties agree that this contract was negotiated on the basis that the Contractor's proposed operations <u>subcontractor, Threshold Aviation Group,[6] will provide the aircraft under lease to the prime contractor</u> . . . .

---

[6] Defendant also notes that, "[a]s an initial matter, this provision is unavailing to NHFP [New Hampshire Flight Procurement] because another subcontractor, Threshold, and not NHFP, is named." Plaintiff contends, however, that, "[d]espite the Contract's language, the aircraft was not supplied by Threshold Aviation Group, but instead a Gulfstream II (N81RR) aircraft, was supplied directly by Plaintiff New Hampshire Flight

<u>The parties agree that the proposed subcontractor's performance is critical to the success of the contract</u>. . . {emphasis added}

The Contractor shall ensure that there are clear lines of communications, including, when necessary, <u>direct communications, between the Government and the opera</u>tions [sic] subcontractor to ensure airworthiness, and safe and successful operations and maintenance of the aircraft."

(modifications and emphasis in original). Plaintiff argues that, "[t]he supplying of a jet is the single, salient item of the entire Contract. The party who supplies the multi-million dollar functional aircraft is obviously the recipient of both the express and implied intention of the parties to the contract." Plaintiff notes that the prime contract between Flight Test Associates and NASA contains five Cost Line Items, which all deal directly with the provision, preparation, and use of the aircraft. Plaintiff further notes that the contract instructs the prime contractor, Flight Test Associates, to "provide aircraft under lease." Therefore, according to plaintiff, "[o]bviously, the owner of the 'aircraft' can reasonably infer an intention" by the government to pay the aircraft owner, "especially when the Contract explicitly calls out for a leased aircraft to be supplied by a named subcontractor."

Plaintiff points to <u>Chevron U.S.A. v. United States</u>, a 2013 decision by a Judge of this court, for the proposition that:

"For third party beneficiary status to be conferred on a party, the "contract must reflect the express or ***implied*** {emphasis added} intention of the [contracting] parties to benefit the third-party." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). ***While third party does not need to be specifically identified in the contract*** {emphasis added}, third party beneficiary status can only be bestowed on the those [sic] parties that 'fall within a class clearly intended to be benefited' by the contract . . .'"

(quoting <u>Chevron U.S.A., Inc. v. United States</u>, 110 Fed. Cl. 747, 782–83 (2013) (quoting <u>State of Montana v. United States</u>, 124 F.3d 1269, 1273 (Fed. Cir. 1997))) (emphasis added). According to plaintiff, "'to determine whether a non-party to a contract is a third party beneficiary, the court must "look to whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him."'" (quoting <u>Chevron U.S.A., Inc. v. United States</u>, 110 Fed. Cl. at 783 (quoting <u>Dewakuku v. Martinez</u>, 271 F.3d 1031, 1041 (Fed. Cir. 2001))). Plaintiff states that in <u>Chevron U.S.A.</u>, the intended third party beneficiary was an owner of certain oil

---

Procurement, LLC to FTA via a lease dated January 6, 2011." Defendant admits in its motion to dismiss, "[t]he prime contract incorrectly identifies Threshold as the provider of the aircraft," and that "[i]nstead, FTA entered into a lease subcontract with plaintiff subcontractor NHFP for the aircraft."

fields. According to plaintiff, the prime contracting party, Chevron, "leased the fields from the land owner for the purpose of entering into a contract with the Government," and the court, therefore, allowed the plaintiff, the owner of the oil fields, to claim a third party beneficiary right to a contract to extract oil from the fields. Plaintiff contends that the facts of the above captioned case parallel those in Chevron U.S.A., Inc. v. United States, because although plaintiff was not a named party to the contract, the unnamed party, like the oil field owner, had a critical role in the contract. According to plaintiff, in the case currently before the court, a section of the government's prime contract with Flight Test Associates was dedicated to the performance of the projected subcontractor, and stated that the "'subcontractor's performance is critical to the success of the contract.'" (emphasis in original). According to plaintiff, "any lease, including that referenced in the Contract, contains lease payments to the Lessor and a beneficial interest therein." Although plaintiff was not specifically mentioned as a subcontractor in the prime contract between Flight Test Associates and NASA, plaintiff points to a number of other decisions from this Circuit, each allegedly supporting the proposition that a third party benefit does not need to be explicitly mentioned in a prime contract to be granted relief, but instead, "[t]he test for intended third party beneficiary status is whether the contract reflects the intent of the parties to the contract to benefit the third party." (citing Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001), U.S. Ecology, Inc. v. United States, 245 F.3d 1352, 1356 (Fed. Cir. 2001), Caguas Cent. Fed. Savings Bank v. United States, 215 F.3d 1304, 1309 (Fed. Cir. 2000), and State of Montana v. United States, 124 F.3d at 1273).

Additionally, defendant responds that, "[t]he Federal Circuit recognizes that third parties to a contract with the Government may sue the Government only if the 'contract reflect[s] the express or implied intention of the [contracting] parties to benefit the third-party.'" (quoting State of Montana v. United States, 124 F.3d at 1273) (modifications in original). Defendant claims that "[i]n order for a third party subcontractor to sue the Government under a prime contract, the prime contract must have a provision, the entire purpose of which is to confer rights upon the third-party subcontractor." Defendant indicates that an example of when a party can be considered a third party beneficiary is in D&H Distributing Co. v. United States, in which the government included "a joint payment clause in the prime contract that required the Government to pay part of its payments under the prime contract directly to a subcontractor." (citing D&H Distrib. Co. v. United States, 102 F.3d 542, 547 (Fed. Cir. 1996)). Defendant also suggests that proper evidence of a third party beneficiary status can come from "a prime contractor's payment bond, which is a contract between the contractor and the surety that ensures that such subcontractors will be paid if the contractor defaults." (citing Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 499 n.1 (Fed. Cir. 1990)). Defendant argues that in the case currently before this court, however, as opposed to the examples cited, the prime contract between Flight Test Associates and NASA "confers no right to NHFP [New Hampshire] at all." Defendant contends that Section H.13 of the prime contract between Flight Test Associates and NASA, "**MONITORING OF SUBCONTRACTOR**," "is to ensure that the prime contractor [Flight Test Associates] utilize a reliable aircraft provider—that is, the purpose of this provision is to provide protection to the Government; it cannot reasonably be read to confer a right

upon a subcontractor." (capitalization and emphasis in original). Defendant cites as support State of Montana v. United States, 124 F.3d at 1273–74, for the proposition that a third party beneficiary "must be 'reasonable in relying on the promise as manifesting an intention to confer a right on him.'" Defendant argues that mere "[e]vidence that the Government has notice that a subcontractor is providing a salient or foundational item to perform the contract is insufficient" to enable the subcontractor to claim a third party beneficiary status in the prime contract between Flight Test Associates and NASA. Defendant also maintains that any other indications of the government's intent, after the contract was executed, such as the e-mails between New Hampshire and NASA, do not confer a third party beneficiary status onto plaintiff, as "[t]he relevant inquiry with respect to third party beneficiary status is the intent of the prime contract parties at the time they entered into the prime contract."

Defendant claims that plaintiff's reference to Chevron U.S.A., Inc. v. United States is misplaced, because, "[c]ontrary to NHFP's assertion otherwise, _Chevron U.S.A., Inc._ did not involve a plaintiff that was an 'actual owner (in fee simple or via lease) of certain oil fields,'" who then leased the oil fields to the government. Instead, according to defendant, in Chevron U.S.A., Chevron already had a contract with the government, acquired through its predecessor Standard Oil, regarding the "joint operation and production of a petroleum reserve." Defendant contends that the dispute in Chevron U.S.A. concerned the narrow issue of ex parte communications with an independent petroleum engineer responsible for allocating rights between Chevron and the government, and that,

> in finding that Chevron was a third party beneficiary of the prime contract, the Court expressly found that the prime contract parties intended to benefit Chevron because the entire purpose of the 1996 agreement between the Government and the IPE [independent petroleum engineer] was to assist the Department and Chevron in finalizing their respective interests in certain oil fields.

 (citing Chevron U.S.A. v. United States, 110 Fed. Cl. at 783).

Instead, defendant analogizes the above captioned case to the United States Court of Appeals for the Federal Circuit's decision in Flexfab, LLC v. United States, 424 F.3d 1254. Defendant contends that in Flexfab, the United States Court of Appeals for the Federal Circuit held that intent to benefit requires more than notice; but also that the government "'knows of a condition precedent to a third-party's performance as a sub-contractor, and _specifically modifies the prime contract so as to ensure the third-party's continued performance._'" (quoting Flexfab, LLC v. United States, 424 F.3d at 1263) (emphasis in original).

Regarding third party beneficiary status, the United States Supreme Court wrote:

> it is recognized as an exception to the general principle, which proceeds on the legal and natural presumption that a contract is only intended for

the benefit of those who made it. Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit.

German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912); see also Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 307 (1927); Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056 ("'In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly*.'" (quoting Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir.))) (emphasis in original), amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001); G4S Tech. LLC v. United States, 114 Fed. Cl. 662, 671 (2014). The United States Court of Appeals for the Federal Circuit has stated that "'[t]he intent of the parties to the contract is therefore the cornerstone of a claim for third-party beneficiary status,'" Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056 (quoting Flexfab, L.L.C. v. United States, 424 F.3d at 1259), and that a "party does not obtain third-party beneficiary status, however, 'merely because the contract would benefit them.'" Id. (quoting FDIC v. United States, 342 F.3d 1313, 1319 (Fed. Cir. 2003)); see also Astra USA, Inc. v. Santa Clara Cnty., Cal., 131 S. Ct. 1342, 1347 (2011) ("A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend.").

"One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." State of Montana v. United States, 124 F.3d at 1273 (citing Restatement (Second) of Contracts § 302(1)(b) cmt. d); Dewakuku v. Martinez, 271 F.3d at 1041; US Ecology, Inc. v. United States, 245 F.3d at 1356; Chevron U.S.A., Inc. v. United States, 110 Fed. Cl. at 783. Of particular importance in the intent analysis is the "contracting officer's understanding of the situation." Flexfab, L.L.C. v. United States, 424 F.3d at 1263. As the Federal Circuit explained:

> We thus hold that for third-party beneficiary status to lie, the contracting officer must be put on notice, by either the contract language or the attendant circumstances, of the relationship between the prime contractor and the third-party subcontractor so that an intent to benefit the third party is fairly attributable to the contracting officer.

Id.; FloorPro, Inc. v. United States, 98 Fed. Cl. 144, 147 (2011), vacated on other grounds, 680 F.3d 1377 (Fed. Cir. 2012); Kawa v. United States; 86 Fed. Cl. 575, 587–88 (noting that "the duty lies with the contractor and/or the third party to make any third-party beneficiary status known to the person in the Government with contracting authority"), motion for relief from judgment denied, 368 F. App'x 106 (Fed. Cir. 2009); see also G4S Tech. LLC v. United States, 114 Fed. Cl. at 671 ("[I]t is possible to infer the requisite intent on the part of the government 'from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party.'" (quoting Flexfab,

L.L.C. v. United States, 424 F.3d at 1262). In addition, "the nonparty must still 'fall within a class clearly intended to be benefited thereby.'" Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056-57 (quoting State of Montana v. United States, 124 F.3d at 1273); G4S Tech. LLC v. United States, 114 Fed. Cl. at 671; Arbelaez v. United States, 94 Fed. Cl. 753, 767 (2010).

Third party beneficiary status is an "exceptional privilege," German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. at 230, which "should not be granted liberally." Flexfab, L.L.C. v. United States, 424 F.3d at 1259; Carter v. United States, 98 Fed. Cl. 632, 637 (2011); see also Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056. As a Judge of this court explained, "'Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.'" Carter v. United States, 102 Fed. Cl. 61, 71 (2011) (quoting Restatement (Second) Contracts § 313, cmt. a (1981)); see also G4S Tech. LLC v. United States, 114 Fed. Cl. at 670 ("Nevertheless, it remains the general rule that a subcontractor that agrees to supply materials or labor to a general contractor is only an incidental beneficiary of any contract between the general contractor and its ultimate client. See 9 Corbin on Contracts § 45.3 (rev. ed. 2007); Restatement (Second) of Contracts § 302 cmt. e., illus. 19.").

The analysis, however, is not completely black-and-white; courts can look past the words of the contract, although only in exceptional circumstances. See State of Montana v. United States, 124 F.3d at 1273 ("The intended beneficiary need not be specifically or individually identified in the contract . . . ."); G4S Tech. LLC v. United States, 114 Fed. Cl. at 671; Chevron U.S.A., Inc. v. United States, 110 Fed. Cl. at 782; see also Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056. "When the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced." Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056-57 (quoting Roedler v. Dep't of Energy, 255 F.3d at 1352; Boye v. United States, 90 Fed. Cl. 392, 409 (2009); O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. at 189 n.12. Nonetheless, "it is extremely difficult to establish status as an intended third-party beneficiary by inference in the context of a government contract." G4S Tech. LLC v. United States, 114 Fed. Cl. at 671. Thus, the question of whether a party is "a third-party beneficiary under the contract is a mixed question of law and fact." Flexfab, L.L.C. v. United States, 424 F.3d at 1259 (citing Glass v. United States, 258 F.3d at 1353).

Considering the facts in the above captioned case in the most favorable light to plaintiff, plaintiff fails to credibly allege any intent by the government to directly benefit plaintiff at the time of awarding the prime contract between Flight Test Associates and NASA. There is no clause that grants a remedy or right in the prime contract to plaintiff. Although the "critical" importance of the subcontractor and aircraft is demonstrated throughout the prime contract between Flight Test Associates and NASA, the subcontractor is not given any rights under the prime contract as a result. Instead, the clause of the prime contract that mentions any subcontractor is designed to protect the government's position, not confer any rights or remedies to the subcontractor New Hampshire:

**H.13 MONITORING OF SUBCONTRACTOR**

The parties agree that this contract was negotiated on the basis that the Contractor's proposed operations subcontractor, Threshold Aviation Group,[7] will provide the aircraft under lease to the prime contractor and will be performing contract requirements related to the airworthiness of the aircraft, aircraft operations, and aircraft maintenance. The parties agree that the proposed subcontractor's performance is critical to the success of the contract. Therefore, the Contracting Officer's written approval is required for any substitution of another operations subcontractor.

. . .

The Contractor shall ensure that there are clear lines of communications, including, when necessary, direct communications, between the Government and the operations subcontractor to ensure airworthiness, and safe and successful operations and maintenance of the aircraft.

Nothing herein relieves the Contractor from responsibility for performing this contract.

Section H.13 puts additional requirements on the prime contractor, Flight Test Associates, to "ensure that there are clear lines of communications, including, when necessary, direct communications, between the government and the separate operations subcontractor, Threshold, to ensure airworthiness, and safe and successful operations and maintenance of the aircraft." The clause also requires "written approval" by the government before the aircraft subcontractor, New Hampshire, is to be switched. The last sentence of the provision, "[n]othing herein relieves the Contractor [Flight Test Associates] from responsibility for performing this contract," further emphasizes that the clause is designed to place burdens on the prime contractor, Flight Test Associates, and protect the government, not create a third party beneficiary relationship with plaintiff New Hampshire.

An examination of the remedies for default and payment provisions under the prime contract between Flight Test Associates and NASA, and the airplane lease agreement between New Hampshire and Flight Test Associates, also does not support plaintiff's argument that it is a third party beneficiary of the prime contract. No particular right to payment, or remedy in case of default was made specifically available to plaintiff in the prime contract between Flight Test Associates and NASA, nor are any facts alleged that indicate that the government specifically modified, or intended to modify, the prime contract to guarantee any payment or assurance of payment to the third party.

---

[7] As noted above, plaintiff, New Hampshire alleges, and the court agrees, that the inclusion of "Threshold Aviation Group" in the contract was a mistake, and New Hampshire's name should have been there instead.

Cf. Kawa v. United States, 86 Fed. Cl. at 587 ("'[W]hen a government agent with authority to contract on the government's behalf knows of a condition precedent to a third party's performance as a sub-contractor, such as receipt of payment directly from the government, and specifically modifies the prime contract so as to ensure the third party's continued performance,'" an intent to benefit the third party can be found. (quoting Flexfab, L.L.C. v. United States, 424 F.3d at 1623)). The prime contract between Flight Test Associates and NASA, in terms of remedies, incorporates by reference "**52.233-4 APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM (OCT 2004)**," which states, that "United States law will apply to resolve any claim of breach of this contract." 48 C.F.R. § 52.233-4 (2013) (last revised October 5, 2004). The prime contract between Flight Test Associates and NASA also lists a number of specific remedies for delays in schedule, but these are only between Flight Test Associates and NASA. New Hampshire's rights to payment and remedies in case of breach are instead detailed in its separate January 6, 2011 aircraft lease agreement between New Hampshire and Flight Test Associates, which was formed after the December 20, 2010 signing of the prime contract between Flight Test Associates and the federal government. The aircraft lease agreement states that, "[i]n the event that NASA terminates the HIWC contract, Lessee [Flight Test Associates] shall be allowed to cancel this Lease Agreement" and will be able to stop paying rent once the plane is returned by Flight Test Associates to New Hampshire in its original condition. The aircraft lease agreement between New Hampshire and Flight Test Associates provides plaintiff recourse against Flight Test Associates, including acceleration of rent, return of the airplane, repairs, and damages in the case of a breach of contract by Flight Test Associates. The aircraft lease agreement between New Hampshire and Flight Test Associates, however, makes clear that the government did not separately agree to benefit plaintiff in case of a breach by Flight Test Associates. The aircraft lease agreement between New Hampshire and Flight Test Procurement states, "[n]o governmental approval is required for Lessor or Lessee to enter into this Lease." In a subcontracting arrangement that does not grant the subcontractor a remedy or any direct ability to collect from the government, it is unreasonable for plaintiff to rely on the subcontract "as manifesting an intention to confer a right on" the third party by the government. See State of Montana v. United States, 124 F.3d at 1273; Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056–57.

In Flexfab, the decision by the United States Court of Appeals for the Federal Circuit is an indication of how difficult it is to achieve third party beneficiary status in a contract with the United States. In Flexfab, the Defense Logistics Agency, Defense Supply Center Columbus contracted with Capital City Pipes, Inc. (Capital City Pipers) to supply air duct hose. See Flexfab, L.L.C. v. United States, 424 F.3d at 1257. "As a supplier without manufacturing capabilities, Capital City [Pipes] entered into a sub-contract with C & S [C & S Industrial Supply Co.], which in turn entered into a sub-contract with Flexfab for production of the hose." Id. Upon request from Flexfab, Capital City Pipes sent a letter to the government to request a modification of the prime contract between Capital City Pipes and the government, so that Flexfab's address could be given as the "Place of Performance" and the destination for remittance of payment. See id. at 1258. The fact that this modification was made specifically for Flexfab's benefit

was unknown to the agency. See id. Capital City Pipes, however, neglected to change the electronic remittance account to send electronic payments to Flexfab. See id. After delivery by the subcontractor, Flexfab to the government, the agency paid Capital City Pipes in full, electronically, and, subsequently, "Capital City later became insolvent and never paid Flexfab." See id. In affirming a United States Court of Federal Claims decision not to award plaintiff third party beneficiary status, the Federal Circuit stated:

> The record reflects that neither Mr. Cook [Chief Executive Officer of C &S Industrial Supply Co.], nor Mr. Taylor [an agency small business specialist], nor any Flexfab personnel ever communicated with the contracting officers to explain and memorialize the alleged demand by Flexfab that it would perform only if paid directly by the government into an escrow account for its benefit. In short, Flexfab relied entirely on others, mainly Capital City, to assure that Flexfab, not Capital City, would receive direct payment for the delivered hose.

Id. at 1258. The Flexfab court stated that, "the contracting officer's understanding of the situation that is key," and emphasized that Flexfab failed to ensure that the contracting officer was aware of, and agreed to, any intent to benefit Flexfab through modification of the prime contract between Capital City Pipes and the government. See id. The Flexfab court stated that "[n]either the contract nor the modification shows intent by the contracting officers to benefit Flexfab by linking in any way the remittance address to Flexfab. Looking beyond the contract itself, Flexfab can point to no evidence of record that establishes such intent." Id. at 1264. In the above captioned case, the mere mention of the subcontractor in a section that discusses monitoring and oversight, coupled with some discussion about the importance of the subcontractor's services, similarly does not indicate any intent by the government's contracting officer to link payment, or any other right under the contract, to the subcontractor.[8]

Although not cited by the parties, another case also involving the failed Capital City Pipes entity, is instructive. In Kawa v. United States, the plaintiff, as the escrow agent, represented another subcontractor to Capital City Pipes also producing hose equipment, JGB Enterprises. See Kawa v. United States, 86 Fed. Cl. at 578. The plaintiff was the "remit to" beneficiary in the prime contract between Capital City Pipes and the Defense Logistics Agency. See id. at 578, 580 (internal quotation omitted). Although the prime contractor, Capital City Pipes, and plaintiff understood this to mean "that it reflected the Government's acceptance of an assignment from Capital City to JGB of the right to receive payment," the government, and Lu Ann Boscy, the contracting officer, did not share that view. See id. at 580. The agency continued remitting to Capital City Pipes, and after Capital City Pipes went bankrupt, plaintiff sued

---

[8] The court in Flexfab also wrote: "By requiring an authorized government contracting officer to be engaged in the creation of enforceable obligations under these section 8(a) contracts, we better equip the government to insure that contracting parties comply with the regulations pertaining to their participation in the program." Flexfab, L.L.C. v. United States, 424 F.3d at 1263–64.

for payments under the contract. See id. The Kawa court held, quoting from Flexfab, that:

> Unfortunately for plaintiff, as in Flexfab, 424 F.3d at 1258, "[t]he record is void of evidence that [Ms. Boscy] knew that the modification to the contract was in any way associated with [JGB's] escrow account. The record reflects that neither [Mr. Bernhardt], nor Mr. Taylor, nor [Mr. Kawa, nor] any [JGB] personnel ever communicated with the contracting officer[ ] to explain and memorialize the alleged demand by [JGB] that it would perform only if paid directly by the government into an escrow account for its benefit. In short, [JGB and Mr. Kawa] relied entirely on others, mainly Capital City, to assure that [Mr. Kawa], not Capital City, would receive direct payment for the delivered hose."

Id. at 587 (quoting Flexfab, L.L.C. v. United States, 424 F.3d at 1258) (modifications in original). The Kawa court noted, "the duty lies with the contractor and/or the third party to make any third-party beneficiary status known to the person in the Government with contracting authority." See id. at 589 (internal quotation omitted).

In the case currently before the court, even with every factual inference viewed in the most favorable light to plaintiff, New Hampshire offered no indication of any effort to make its alleged right to payment under the prime contract between Flight Test Associates and NASA known to the government's contracting officer, until well after payments stopped being received by New Hampshire from the prime contractor, Flight Test Associates. See id. at 588; Flexfab, L.L.C. v. United States, 424 F.3d at 1263. New Hampshire did not attempt to amend the prime contract between Flight Test Associates and NASA to have NASA remit payments directly to New Hampshire, like the plaintiffs in Kawa and Flexfab attempted to do. See Kawa v. United States, 86 Fed. Cl. at 588; Flexfab, L.L.C. v. United States, 424 F.3d at 1258. The court in Kawa stated that "[o]f course, the appearance of an entirely new entity in the remittance address, along with specific notifications to the Government that rights under the contract were being assigned to that entity and unmistakable Government recognition of that assignment would likely create rights in the assignee." Kawa v. United States, 86 Fed. Cl. at 588–89 (citing Riviera Finance of Texas, Inc. v. United States, 58 Fed. Cl. 528 (2003)). Neither in Kawa, nor in New Hampshire's case, however, did those actions occur or were alleged to have occurred. Cf. JGB Enters., Inc. v. United States, 63 Fed. Cl. 319, 334 (2004), motion for relief from judgment denied, 71 Fed. Cl. 468, appeal dismissed, 192 F. App'x 962 (Fed Cir. 2006), aff'd, 496 F.3d 1259 (Fed. Cir. 2007) (finding that JGB Enterprises was a third party beneficiary to another purchase order because "[t]he only reasonable interpretation of the record mandates a finding that the Government intended to modify the contract to assure JGB of payment so that JGB would ship the hose assemblies that were 'urgently' needed.") (internal citation omitted).

Plaintiff points to discussions plaintiff had with the government about Flight Test Associates' failure to pay its subcontractors. Plaintiff alleges that NASA was informed that New Hampshire was not getting paid by Flight Test Associates as early as June 14,

2012. Plaintiff further states that its counsel on October 3, 2012, "conducted a telephonic conversation with Jerald J. Kennemuth, Attorney for NASA, to discuss past due payments owed to Plaintiff" from its subcontract with Flight Test Associates. Plaintiff also states in its complaint that it sent an invoice to NASA for $39,500.00 on October 15, 2012, and engaged in further communications with NASA thereafter. None of those conversations indicate, however, that plaintiff would not perform unless a "condition precedent" was met by the government, or that the contracting officer was going to modify "the prime contract [between Flight Test Associates and NASA] so as to ensure the third party's continued performance." See Flexfab, L.L.C. v. United States, 424 F.3d at 1263. Defendant correctly contends that intent to endow third party beneficiary status requires more than notice to the government; but also that the government "'knows of a condition precedent to a third-party's performance as a sub-contractor, and *specifically modifies the prime contract so as to ensure the third-party's continued performance.*'" (quoting id.) (emphasis in original). The government's communications with plaintiff, New Hampshire, indicate that, while the government may have communicated with plaintiff about the possibility of "continued leasing of the N81RR aircraft," or purchase of the airplane, in the end the government denied all of the claims. (emphasis in original). When Ms. Huth of NASA stated "I anticipate that NASA will want to do a final review of the aircraft and will then be ready to have the plane returned to possession by the aircraft owner." (emphasis in original), that signified an end to the relationship and a return of plaintiff's property, not "as manifesting an intention to confer a right . . . ." See Dewakuku v. Martinez, 271 F.3d at 1041.

The decision in G4S Technology LLC v. United States also speaks to plaintiff's contention that its numerous correspondences with the government somehow garnered a third party beneficiary right in the prime contract to plaintiff. In G4S Technology LLC v. United States, a subcontractor, G4S Technology LLC (G4S), provided engineering services to the prime recipient of a loan by the federal Rural Utilities Service, named Open Range, for the construction of rural wireless broadband. See G4S Tech. LLC v. United States, 114 Fed. Cl. at 664–65. When Open Range started running into financial troubles, "the Administrator of the RUS [Rural Utilities Service], received multiple e-mails indicating that Open Range's vendors were seeking immediate payment of past-due bills from Open Range." Id. at 666–67. The court in G4S Technology noted that multiple conversations were ongoing by and within the Rural Utilities Service about subcontractor payments, and that the agency was aware that, "Open Range's arrearages to its vendors represented a risk to deploying the broadband network." See id. at 667. In the litigation that ensued after Open Range's bankruptcy, G4S asserted a claim against the government for payments defaulted on by Open Range. See id. at 668–69. The court wrote the following:

> [I]in order for a subcontractor to obtain the status of an intended third-party beneficiary, it must provide *clear* evidence that an authorized government official approved a contract provision for the *express* purpose of effectuating payment from the government to the subcontractor(s). This showing can be satisfied by the unambiguous language of the prime contract and any modifications made thereto, and by other objective

evidence that clearly demonstrates the authorized official's unambiguous intent to ensure payment to the subcontractor(s). The court will not, however, infer that the government intended to directly benefit the subcontractor merely because an authorized government official (1) oversees the activities of the prime contractor; (2) becomes aware that the prime contractor has failed to timely pay its subcontractors, and/or (3) makes funds available to the prime contractor in order for the prime contractor to pay its subcontractors.

Id. at 672–73. The G4S Technology court found that, despite the agency being aware of vendor issues, "plaintiff has not identified any provision of the Loan Amendment, Equity Commitment Letter (including Schedule B–1), or Shareholder Agreement in which RUS unambiguously agreed to modify the loan advance process for the express purpose of effectuating payment directly to Open Range's vendors." Id.

Similarly, in the above captioned case, NASA's mere awareness of plaintiff's difficulties in getting payment from Flight Test Associates was insufficient to create a third party status, as plaintiff, New Hampshire, has failed to allege that the prime contract between Flight Test Associates and NASA identified New Hampshire as an intended beneficiary of the contract, or that the agency "unambiguously agreed to modify" any agreement in order to effectuate payment to plaintiff. See id. The court in G4S Technology determined that increased oversight by the government on the prime contractor still failed to create a third party beneficiary status in a subcontractor. See id. ("RUS's close oversight of Open Range, awareness of Open Range's arrearages, and willingness to advance loan funds to Open Range, taken individually or in combination, are insufficient to demonstrate that RUS approved the Loan Amendment for the express purpose of directly or jointly paying Open Range's vendors."). In the above captioned case, the provision "**H.13 MONITORING OF SUBCONTRACTOR**" in the prime contract between Flight Test Associates and NASA, similarly allowed for close oversight of Flight Test Associates by the government, but, as in G4S Technology, did not offer any subcontractor with third party beneficiary status. (capitalization and emphasis in original).

The case plaintiff points to, Chevron U.S.A. v. United States, is distinguishable from the above captioned case. In Chevron U.S.A., as noted above, Chevron's predecessor, Standard Oil Company and the United States had entered into an earlier contract governing joint operation and production of Naval Petroleum Reserve No. 1." Chevron U.S.A., Inc. v. United States, 110 Fed. Cl. at 752–53. The government's interest was then transferred to the Department of Energy. See id. at 754. To resolve the equity allocation within Naval Petroleum Reserve No. 1 between Chevron and the Department of Energy, Congress required the Department of Energy to determine the equity interests after obtaining the recommendation from an independent petroleum engineer, who was mutually acceptable to the parties. See id. The contract engaging the independent petroleum engineer was made between the Department of Energy and the engineer, and Chevron was not a party to it. See id. at 798–99. As part of this process, the Department of Energy and Chevron agreed on a procedure for interacting

with the engineer, which "prohibited Chevron and DOE [the Department of Energy] from having *ex parte* communications with the" expert. See id. at 756. The Department of Energy was found to have breached this protocol in a number of ways. See id. at 800. Although the government tried to argue that Chevron could not bring suit for this breach, as it was not in privity with the engagement contract between the Department of Energy and the independent petroleum engineer, the court found that Chevron was a third party beneficiary to the agreement. See id. at 782-83. The court directed that, "to determine whether a non-party to a contract is a third party beneficiary, the court must 'look to whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him.'" Id. at 783 (quoting Dewakuku v. Martinez, 271 F.3d at 1041). The court in Chevron U.S.A. found:

> In this case, the July 8, 1996 contract between DOE and the Equity IPE expressed that both DOE and the Equity IPE intended Chevron to benefit from the procedures set forth in the Equity IPE Protocol. The Equity IPE was retained to provide "independent and impartial" equity determinations to "adequately protect" the interests of both DOE and Chevron. In fact, Ms. Egger agreed that it was reasonable for Chevron to rely on the *ex parte* prohibition in the Equity IPE Protocol.

Id.

The unique fact pattern in Chevron U.S.A. is far different from the procurement contract at issue in the above captioned case. The contract in Chevron U.S.A. was designed also to "protect" the interests of Chevron in a dispute between the Department of Energy and Chevron, and the Department of Energy stated that Chevron could reasonably rely on the contract. See id. In plaintiff's case, however, the prime contract between Flight Test Associates and NASA makes clear that, "[t]he intent of this contract is for a Contractor to provide an aircraft modified with Government furnished instrumentation to conduct High Ice Water Content (HIWC) flight research." There is no evidence that the contract was intended to protect or assure payment to any subcontractor, no matter how critical their role, or that the contracting officer ever indicated that New Hampshire could rely on the prime contract between Flight Test Associates and NASA to create a direct relationship with the defendant.

Plaintiff relies on the fact that the airplane it provided to Flight Test Associates was essential to the prime contract between Flight Test Associates and NASA, since high-altitude atmospheric testing requires a working airplane. Plaintiff notes that the prime contract's Cost Line Items center around preparation or use of an airplane, and that "[t]he supplying of a jet is the single, salient item of the entire Contract." The importance of a third party to a contract, however, does not mean the parties to the contract intended their arrangement to directly benefit the third party. See Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1056 ("In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly*." (quoting Glass v. United States, 258 F.3d at 1354)) (emphasis in

original). In many government contracts there are multiple subcontractors, each with critical roles to play. Allowing any subcontractor to attain a third party beneficiary status upon a showing that it was a "critical" part of the work statement would go against the United States Supreme Court's guidance that third party beneficiary status is an "exceptional privilege," German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. at 230, which, as the Federal Circuit additionally notes, "should not be granted liberally." Flexfab, L.L.C. v. United States, 424 F.3d at 1259. A finding of third party beneficiary status creates a waiver of sovereign immunity in disputes before this court, and the traditional view is that "[w]aivers of sovereign immunity are construed narrowly." Hinck v. United States, 446 F.3d 1307, 1313 (Fed. Cir. 2006) (quoting Chancellor Manor v. United States, 331 F.3d 898; Flexfab, L.L.C. v. United States, 424 F.3d at 1263 ("But the government does not lightly consent to suit."); Travelers Cas. & Sur. Co. of Am. v. United States, 103 Fed. Cl. 101, 103 (2012); see also Normandy Apartments, Ltd. v. United States, 100 Fed. Cl. 247, 254 (2011) ("[T]he effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." (quoting Cienega Gardens v. United States, 194 F.3d at 1239)); Carter v. United States, 98 Fed. Cl. at 635. Allowing a subcontractor, even a critical one, to be given third party beneficiary rights under a prime contract, based simply on its importance to the prime contract, does not comport with established precedent.

Plaintiff also argues that, from October 19, 2012, the day the government cancelled the prime contract between Flight Test Associates and NASA, "Defendant imposed an obligation on Plaintiff, by possessing dominion and control over Plaintiff's Aircraft, creating an implied contract." Although plaintiff does not clarify in its complaint what type of "implied" contract it is referring to, in its response to defendant's motion to dismiss plaintiff's complaint, plaintiff explains that it its jurisdictional arguments are in part, "based upon the theories of . . . implied-in-fact contract." Plaintiff states, in support of its argument, that "[f]rom October 19, 2012 and at various times since, Defendant has requested that the Aircraft containing its equipment be secured and safe, and that its equipment remain on said Aircraft and that such equipment be accessible to Defendant." Plaintiff points to a letter attached to defendant's motion to dismiss, which indicates that, as of October 9, 2012, the government still desired to hold onto the airplane despite known issues with the prime contractor, Flight Test Associates. The letter dated October 9, 2012 from NASA to Flight Test Associates, but not to plaintiff, states: "Because there is still a substantial amount of Government property on board the plane, and the ongoing status of the HIWC project within NASA is still undetermined, we need to ensure that the aircraft will be kept in a secure location where Government personnel can have continued access."[9] Plaintiff also relies on a "communication from

---

[9] Defendant also notes that the request to keep the aircraft safe was made to Threshold, not to New Hampshire, citing the complaint from Threshold in the parallel case before this court. See Complaint ¶ 56, Threshold Techs., Inc. v. United States, No. 13-599C ("From October 19, 2012 and at various times since, Defendant has requested of Plaintiff [Threshold Technologies], that the Aircraft containing its equipment be secured and safe, and that its equipment remain on said Aircraft and that such equipment be accessible to Defendant.").

[Ms.] Huth, Defendant's Contracting Officer, in her March 12, 2013 e-mail: 'Once these items have been removed from the plane, <u>I anticipate that NASA will want to do a final review of the aircraft and will then be ready to have the plane returned to possession by the aircraft owner</u>.'" (internal citation omitted in original; emphasis in original).

Although this statement suggests an end to the utilization of the airplane, plaintiff, nonetheless, incorrectly infers that this e-mail was an admission by defendant that NASA intended to contract for leasing of the airplane after expiration of the prime contract between Flight Test Associates and NASA. Similarly, trying to keep defendant's property on the plane secure also does not create an express or implied-in-fact contract between plaintiff, New Hampshire, and the government. Moreover, according to defendant, "[t]he complaint contains no allegation that the Government separately agreed to a rent price or other terms of NHFP's [New Hampshire's] aircraft lease with NHFP after the October 19, 2012 termination for default" of the prime contract, Defendant further contends that no authority supports an argument that "mere knowledge of the subcontract by the Government, and a presumption that a subcontract has payment terms, could impute that contractual agreement to the Government."

As noted above, "[t]o establish the existence of a valid contract with the United States, whether express or implied-in-fact, a plaintiff must show (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon." <u>Vargas v. United States</u>, 114 Fed. Cl. at 233 (citing <u>Kam–Almaz v. United States</u>, 682 F.3d at 1368; <u>Suess v. United States</u>, 535 F.3d 1348, 1359 (Fed. Cir. 2008); <u>Flexfab, L.L.C. v. United States</u>, 424 F.3d at 1265; <u>City of El Centro v. United States</u>, 922 F.2d at 820; <u>see also</u> <u>Night Vision Corp. v. United States</u>, 469 F.3d at 1375 ("The elements of an implied-in-fact contract are the same as those of an oral express contract."); <u>Hanlin v. United States</u>, 316 F.3d at 1328; <u>Huntington Promotional & Supply, LLC v. United States</u>, 114 Fed. Cl. at 767. The facts, as alleged by plaintiff, even given all possible inferences in favor of plaintiff, do not support plaintiff's contention that the mere holding of the plane by the government, prior to a clear indication of returning it to plaintiff, or discussion of a possible future lease, led to an implied-in-fact contract between the parties. The record contains a November 26, 2012 e-mail from the contracting officer Ms. Huth to Mr. Fullmer requesting cost estimates "'for (1) <u>continued leasing</u> of the N81RR aircraft and (2) the cost buy-out if NASA wanted the option to purchase the plane . . . .'" (emphasis in original). A request for pricing information also does not create a lack of ambiguity or offer and acceptance, and does not bring a contract between plaintiff and the government into existence. <u>See</u> <u>Anderson v. United States</u>, 344 F.3d at 1353, 1353 n.3; <u>City of El Centro v. United States</u>, 922 F.2d at 820; <u>Vargas v. United States</u>, 114 Fed. Cl. at 233.

Plaintiff has failed to allege any other facts which could help make it appear "plausible on its face" that the government accepted, or planned to accept, a contract for continued leasing of the airplane. <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555. There is no evidence alleged that NASA decided to hold onto the plane long-term, or form a contract with plaintiff, after October 19, 2012, the date NASA cancelled the

contract with Flight Test Associates. The record currently before the court indicates that by November 3, 2012, just two weeks after the prime contract between NASA and Flight Test Associates was cancelled, "Threshold arranged to fly the aircraft from NASA's leased hangar in to its own hangar in Chino, California on NHFP's behalf," and therefore the plane was already out of the government's physical possession. Moreover, just a few months after the March 12, 2013 request by NASA regarding government equipment aboard the New Hampshire airplane, plaintiff's complaint indicates that, "Defendant's last remaining installed equipment was finally removed from Plaintiff's aircraft." The approximately eight months, from October 2012 to May 2013, between when the prime contract between Flight Test Associates and NASA was ended and when the government's equipment was removed from plaintiff's airplane is not sufficient in and of itself to establish that an implied-in-fact contract formed between New Hampshire and the government, given all the requirements that must be met to form a contract with the government.

Plaintiff, New Hampshire, claims: "Beginning in June of 2012, or sooner, Defendant knew that FTA was defaulting in its duties under the Contract, including failure to make payment to vital parties who were essentially subcontractors," and yet, despite communications of these failures by plaintiff, defendant failed to act. Plaintiff alleges that these actions by the government, along with defendant's "refusal to compensate Plaintiff for the occupation of the Aircraft," after the cancellation of the prime contract between Flight Test Associates and NASA on October 19, 2012, violated the covenant of good faith and fair dealing, as well as 48 C.F.R. § 1.602-2 (2013), which, according to plaintiff, "requires the contracting officer to ensure impartial, fair, and equitable treatment." Plaintiff alleges that defendant "purposely employed delay tactics" to get out of forming an express contract with plaintiff, "all the while, slowly having Defendant's property removed from Plaintiff's aircraft." Defendant responds that "'[t]he covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner,'" quoting from Centex v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005). Defendant states that "[t]he covenant of good faith and fair dealing, therefore, does not arise where the parties have no contract between them, as is the case here." Therefore, according to defendant, this claim must be dismissed "because it fails to state a claim upon which relief may be granted."

"All government contracts contain an implied covenant of good faith and fair dealing." Nat'l Australia Bank v. United States, 55 Fed. Cl. 782, 790 (2003), aff'd, 452 F.3d 1321 (Fed. Cir. 2006). "However, the implied obligation '"must attach to a specific substantive obligation, mutually assented to by the parties."'" Detroit Housing Corp. v. United States, 55 Fed. Cl. 410, 417 (2003) (quoting Allstates Air Cargo, Inc. v. United States, 42 Fed. Cl. 118, 124 (1998) (quoting State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997) (table), cert. denied, 522 U.S. 1108 (1998))); see also Night Vision Corp. v. United States, 68 Fed. Cl. 368, 389 (2005) ("Clearly, the case has at its predicate the existence of a valid, mutually assented-to contract, for which a covenant arises that proscribes the government from interfering with reasonable expectations flowing from that particular contract."), aff'd, 469 F.3d 1369 (Fed. Cir. 2006), cert. denied, 550 U.S. 934 (2007). Plaintiff, New Hampshire, has

failed to provide any evidentiary basis for the existence of an alleged express or implied-in-fact contract. Plaintiff also has failed to show, based on the facts and allegations presented, even with all factual inferences viewed in the light most beneficial towards plaintiff, that it was a third party beneficiary to the prime contract between Flight Test Associates and the federal government. In short, plaintiff has failed to allege that it is in privity with the federal government. Because plaintiff does not have a contract with the government, its claim that there was a breach of the covenant of good faith and fair dealing also fails. See Detroit Housing Corp. v. United States, 55 Fed. Cl. at 419. Similarly, without a contractual relationship with the government, plaintiff is unable to rely on 48 C.F.R. § 1.602-2 to allege improper conduct on the part of the government. See 48 C.F.R. § 1.602-2 ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships. . . . Contracting officers shall-- . . . Ensure that contractors receive impartial, fair, and equitable treatment.").

Plaintiff's last claim for recovery is under the theory of quantum valebant. According to the United States Court of Appeals for the Federal Circuit:

> Quantum valebant is "[t]he reasonable value of goods and materials." Black's Law Dictionary 1276 (8th ed. 2004). In general, the difference between quantum meruit and quantum valebant is that "[t]he former is said to apply to services and the latter to goods . . . ." Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1154 n. 8 (Fed. Cir. 1983).

United Pac. Ins. Co. v. United States, 464 F.3d at 1330 n.3. This court has noted that "[t]he distinction however, is not significant, as courts have used quantum meruit to refer to both." Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. 382, 410 n.26 (2008) (citing United States v. Amdahl Corp., 786 F.2d 387).

Plaintiff contends that "[w]ithin the last two years Plaintiff supplied and delivered certain goods at the special request of Defendant; and Defendant agreed to pay the reasonable value of those goods." Plaintiff further contends that although defendant had "dominion and control" over the airplane, it never compensated plaintiff, and, therefore, defendant "has been unjustly enriched by occupying a jet aircraft (which cost millions of dollars) for over eight months without paying any party for such occupation." Defendant argues, in response, that the court's jurisdiction under the Tucker Act "'extends only to contracts either express or implied in fact, and not to contracts implied in law,'" quoting from Hercules, Inc. v. United States, 516 U.S. at 423. Defendant maintains, "where the Government accepts services for which it is not otherwise contractually obligated to pay, only an implied-in-law contract is at issue and any resulting claim is outside this Court's Tucker Act jurisdiction." Defendant argues "[u]njust enrichment is an example of a theory of recovery based upon an implied-in-law contract," and plaintiff's quantum valebant claim is outside of this court's jurisdiction. See Hercules, Inc. v. United States, 516 U.S. at 423 (The United States Supreme Court has "repeatedly held that this jurisdiction [under the Tucker Act] extends only to contracts either express or implied in fact, and not to claims on contracts implied in law."); Lumbermens Mut. Cas. Co. v.

United States, 654 F.3d 1305, 1315 (Fed. Cir.) (When plaintiff "sought reimbursement from the government under the theory that, by fully performing its bond obligation, Lumbermens conferred more benefit on the government than was legally required and the government was unjustly enriched," the court concluded that this was a implied-in-law theory of recovery, because plaintiff wanted recovery under equity principles "in order to prevent an injustice."), reh'g en banc denied (Fed. Cir. 2011); Barrett Refining Corp. v. United States, 242 F.3d 1055, 1059 (Fed Cir.) (stating that the Tucker Act "'does not reach claims based on contracts implied in law, as opposed to those implied in fact'" (quoting United States v. Mitchell, 463 U.S. at 218), reh'g denied (Fed. Cir. 2001); Lawndale Restoration Ltd. P'ship ex rel. Boulevard Realty Servs. Corp. v. United States, 95 Fed. Cl. 498, 506 (2010), appeal dismissed, 459 F. App'x 913 (2011); see also Cent. Freight Lines, Inc. v. United States, 87 Fed. Cl. 104, 112 n.8 (2009) (Agreeing with the government's view that "a claim of unjust enrichment is equitable in nature and is not based on a contractual relationship," and "'is therefore based upon a contract implied in law, over which this court has not been given jurisdiction.'" (quoting Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409)).

The United States Court of Appeals for the Federal Circuit has indicated:

A recovery in quantum meruit[ or quantum valebant,] is based on an implied-in-law contract. That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1) (2000).

Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007); see also Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003) (In an quantum meruit claim implied in law, "[t]he theory is that if one party to a transaction provides goods or services to the other party that the parties intended would be paid for, but the recipient refuses to pay for them, the law will imply a contract for the recipient to pay the fair value of what it has received." (citing United States v. Amdahl Corp., 786 F.2d at 393)); Am. Tel. & Tel. Co. v. United States, 124 F.3d 1471, 1479 (Fed. Cir. 1997) ("Quantum meruit is the name given to an implied-in-law remedy for unjust enrichment. As a general rule, it falls outside the scope of relief available through the Court of Federal Claims." (citing Trauma Serv. Group v. United States, 104 F.3d at 1324–25)), granting reh'g en banc and vacating on other grounds, 136 F.3d 793 (Fed. Cir. 1998), reh'g en banc, 177 F.3d 1368 (Fed. Cir. 1999).

In limited circumstances, a contractor can seek recovery on a contract claim on a quantum meruit or quantum valebant basis when, for example, the government attempted to form a contract with a private party, but a defect prevented the contract "from actually coming into existence or the government simply refuses to pay." Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409-10; see also Lumbermens Mut. Cas. Co. v. United States, 654 F.3d at 1317 n.9; Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. at 252-53. As explained by the United States Court of Appeals for the Federal Circuit:

On the other hand, "[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract." United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1329–30 (Fed. Cir. 2006).

Int'l Data Prods. Corp. v. United States, 492 F.3d at 1325. The Federal Circuit also stated in United Pacific Insurance Co. v. United States:

> "*Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity*. The contractor is not compensated under the contract, but rather under an implied-in-fact contract."

United Pac. Ins. Co. v. United States, 464 F.3d at 1333 (quoting United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed. Cir. 1986)) (footnote omitted; emphasis in original).

The United States Court of Appeals for the Federal Circuit, in Perri v. United States, explained that the exception to the traditional rule to refer to quantum valebant or quantum meruit claims as implied-in-law claims requires that at some point there was an attempted contract between the government and the plaintiff:

> Perri relies upon cases in which this court, the Court of Claims, and the Court of Federal Claims recognized *quantum meruit* recovery. See, e.g., Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991); Prestex, Inc. v. United States, 162 Ct. Cl. 620, 320 F.2d 367 (1963). Those cases, however, involved situations in which the plaintiff provided goods or services to the government pursuant to an express contract, but the government refused to pay for them because of defects in the contract that rendered it invalid or unenforceable. Since in that circumstance it would be unfair to permit the government to retain the benefits of the bargain it had made with the plaintiff without paying for them, the courts utilized *quantum meruit* as a basis for awarding the plaintiff the fair value of what it supplied to the government.
>
> We know of no case, however, and Perri has not cited any, in which either we, the Court of Claims, or the Court of Federal Claims has permitted *quantum meruit* recovery in the absence of some contractual arrangement

between the parties. In the present case, the Court of Federal Claims ruled that there was no contract between Perri and the government to pay him twenty-five percent of the amount the government received from the forfeiture that Perri alleged he aided the government in obtaining.

Perri v. United States, 340 F.3d at 1343–44. The United States Court of Federal Claims interpreted Perri as follows:

> While it is true that the Federal Circuit and Court of Claims have permitted *quantum meruit* **recovery**, this occurs in the very limited circumstance where a plaintiff provides services or goods to the government pursuant to an *attempted* express contract, but either some defect prevents an express contract from actually coming into existence or the government simply refuses to pay. See Perri v. United States, 340 F.3d 1337, 1343–44 (Fed. Cir. 2003) (citing Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991); United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed. Cir. 1986); and Prestex, Inc. v. United States, 162 Ct. Cl. 620, 320 F.2d 367 (1963)). In this type of case, a contract is found if a meeting of the minds can be inferred, "as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Hercules, 516 U.S. at 424, 116 S. Ct. 981 (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597, 58 Ct. Cl. 709, 43 S. Ct. 425, 67 L.Ed. 816 (1923)).

Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409 (footnote omitted; emphasis in original); see also Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. at 252–53 ("*quantum meruit* permits the contractor to be 'compensated under an *implied-in-fact contract* when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid.'" (quoting Gould, Inc. v. United States, 67 F.3d at 930) (emphasis in original); Veridyne Corp. v. United States, 83 Fed. Cl. 575, 585-86 (2008) ("'[T]hough a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it.' Id. [United States v. Amdahl Corp., 786 F.2d at 393.] This is so even where 'an award is plainly or palpably illegal" and "made contrary to statutory or regulatory requirements because of some action or statement by the contractor.' Id. at 395.").

A Judge of United States Court of Federal Claims explained that to recover on a quantum meruit or quantum valebant basis, however, the circumstances must permit the court to conclude that all the basic elements of an implied-in-fact contract were present between plaintiff and the government at the time of the alleged contract creation, including mutual intent, offer, acceptance, consideration, and authority on behalf of the government party to contract:

"For contracts with the United States, however, an implied-in-fact contract—just as an express contract—requires an authorized agent of the Government." Trauma Service Group v. United States, 104 F.3d at 1326 (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)). Importantly, an implied-in-fact contract will not be found if an express contract already covers the same subject matter. Id. [Trauma Serv. Grp. v. United States, 104 F.3d at 1326]; see also Atlas Corp. v. United States, 895 F.2d 745, 754–55 (Fed. Cir. 1990).

Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 10; see also Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. at 253 ("Because Ms. Forcia did not possess the authority to bind the government to Amendments 2 or 6, the Council cannot demonstrate the existence of an implied-in-fact contract on which to base *quantum meruit* recovery. Its claim for such recovery must accordingly be denied." (internal citation omitted)). As explained above, "[t]he requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total Med. Mgmt., Inc. v. United States, 104 F.3d at 1319; City of Cincinnati v. United States, 153 F.3d at 1377.

In the above captioned case, even with all reasonable factual inferences read in favor of plaintiff, no express or implied-in-fact contract existed between plaintiff and defendant. See Total Med. Mgmt., Inc. v. United States, 104 F.3d at 1319. The case law requires at a minimum a mutually attempted contract to allow for recovery on a "*quantum meruit* basis." See Int'l Data Prods. Corp. v. United States, 492 F.3d at 1325; Perri v. United States, 340 F.3d at 1343–44; Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409–10. In its complaint, plaintiff tries to point to equity considerations to support its claim. Plaintiff states that defendant was "unjustly enriched by occupying a jet aircraft" for eight months. Plaintiff's allegation, however, fails in this court. See Lumbermens Mut. Cas. Co. v. United States, 654 F.3d at 1316; Cent. Freight Lines, Inc. v. United States, 87 Fed. Cl. at 112 n.8; Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. at 409.

## CONCLUSION

For the foregoing reasons, plaintiff, New Hampshire, did not enter into an express or implied-in-fact contract with the federal government, and, therefore, does not have privity of contract with the federal government. Plaintiff also is not a third party beneficiary to the prime contract between the Flight Test Associates and the federal government. Because plaintiff is not in a contractual relationship with the federal government, plaintiff's claim of breach of the covenant of good faith and fair dealing also cannot be considered by this court. Plaintiff's prayer for quantum valebant relief is not linked to a contractual relationship in place with the federal government. Therefore, the

court **GRANTS** defendant's motion to **DISMISS** New Hampshire's complaint. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

   **IT IS SO ORDERED.**

                                        s/Marian Blank Horn
                                        **MARIAN BLANK HORN**
                                              **Judge**